Bloomingdale Dairy Co., Inc. v. Commissioner.
Bloomingdale Dairy Co. v. Commissioner
Docket No. 81879.
United States Tax Court
T.C. Memo 1961-117; 1961 Tax Ct. Memo LEXIS 233; 20 T.C.M. (CCH) 575; T.C.M. (RIA) 61117; April 27, 1961
Martin D. Cohen, Esq., 744 Broad St., Newark, N.J., for the petitioner. Sheldon Seevak, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income taxes of petitioner for the taxable years ended April 30, 1954, and April 30, 1955, in the amounts of $6,960 and $8,365, respectively. The sole issue is whether there should be excluded from petitioner's gross income for the taxable years ended April 30, 1954, and April 30, 1955, the respective amounts of $23,700 and $26,595.20, which it rebated to certain of its customers. Findings of Fact Some of the facts have been stipulated, and, as stipulated, they are incorporated herein by reference. Petitioner is a corporation organized under the laws of the State of New Jersey. Its principal office is located at 138 Hunterdon Street, Newark, New Jersey. It filed United States income tax returns for the taxable years ended April 30, 1954, and April 30, 1955, and an amended return for the taxable year ended April 30, 1954, with the district director of internal revenue at Newark, New Jersey. It kept *235 its books and filed its income tax returns on an accrual method of accounting. During the taxable years petitioner engaged in the wholesale and retail sale of milk and milk products in the State of New Jersey. Under New Jersey law, only milk dealers, processors, subdealers and stores which are duly licensed by the State are permitted to sell, transport, import, dispose of, store or distribute milk or otherwise engage in the milk business within the State. Petitioner was duly licensed to sell milk in the State of New Jersey. The Office of Milk Industry (hereinafter referred to as OMI) is a legally constituted agency of the State of New Jersey whose Director is empowered by statute to fix the price at which milk is to be bought, sold or distributed; regulate conditions and terms of sale; establish and require observance of fair trade practices; and supervise, regulate and control the entire milk industry of the State of New Jersey. During the period from May 1, 1953, to February 15, 1955, various orders and regulations of the Director of OMI were in full force and effect which established minimum prices for the sale of milk, cream and milk products in the State of New Jersey. *236 Petitioner does not, itself, produce any milk or other dairy products. Prior to 1933, when OMI was originally created, and at all times since, petitioner has been purchasing milk and other dairy products from the Middletown Milk and Cream Company, a producing dairy located in Slate Hill, New York. Petitioner, in turn, makes sales of milk and related dairy products at wholesale prices to such retail outlets as grocery stores, dairy stores, restaurants, lunch rooms, and small supermarkets. More milk is consumed in New Jersey than is produced there, necessitating a daily importation of milk into the state. Milk imported into New Jersey could be bought for less than the price of New Jersey produced milk as fixed by OMI. During the period in question New Jersey dealers buying from Middletown paid lower prices than those prevailing in New Jersey. During the years 1953 through 1955 competition between petitioner and its competitors in the milk industry serving the New Jersey area was keen and neither petitioner nor its competitors adhered to the minimum prices which OMI had prescribed. Petitioner often received demands from its wholesale customers for downward adjustments in prices. *237 These customers threatened to discontinue buying from petitioner unless it complied with their demands. It was therefore faced with the possible dilemma of either violating OMI minimum price regulations or losing customers. In some instances where it did not meet the price reductions offered by its competitors it lost customers. Petitioner grouped its wholesale customers into two geographical areas. The customers in one such area were served by Louis Max and those in the other area by his brother, Harry Max. Louis was treasurer and a director of petitioner. He also was General Sales Manager of petitioner's wholesale department. Most of petitioner's sales were made at wholesale. Harry was secretary and a director of petitioner. His duties were generally similar to those of Louis. It was the practice of Louis and Harry to call upon most of petitioner's customers once a week and to make collections for milk sold to them during the preceding week. Approximately 95 per cent of petitioner's customers were on a weekly payment basis. Petitioner also made cash (COD) sales to some customers. However, such cash sales represented only a small part of petitioner's total sales volume. *238 It was a common occurrence for petitioner's customers to send word to petitioner requesting that either Harry Max or Louis Max call upon them. Upon responding to such requests, Harry (or Louis) was told by the customer that the latter wished to pay a lower price for milk. Such requests were at times accompanied by threats to discontinue patronizing petitioner unless it agreed to a reduction in price. In such circumstances, Harry and Louis, acting on petitioner's behalf, worked out the best price arrangements they were able to negotiate. The agreements relating to downward price adjustments which petitioner entered into with various of its customers were all oral. The terms of such agreements varied from customer to customer. Some agreements were on a percentage basis and provided for a reduction in price ranging from 2 per cent to 12 per cent; other arrangements were on a per-quart basis, ranging from 1/2 cent to 2 cents reduction in price per quart. In each instance, from petitioner's standpoint, it was a matter of negotiating the best terms possible. Actual deliveries of petitioner's products were made by drivers. At the end of each day, petitioner's drivers returned to its *239 office and turned into the bookkeeper a ticket showing merchandise delivered to each customer for that day. The bookkeeper then posted the information shown on the daily tickets to a weekly statement or invoice. The invoice would then be priced out; that is, the price for each item sold by petitioner would be shown and this price would be multiplied by the number of units sold to the customer during the week. The prices used were in all instances the minimum prices permitted by OMI. When each of petitioner's wholesale customers was called upon by either Louis or Harry, the customer would be presented with his bill or invoice showing the previous week's purchases at OMI prices and he would make payment in the full amount of the invoice. Some customers paid with their own checks, and some with checks of third persons. However, to a large extent, payment was received by petitioner in cash. When calling on customers, Louis and Harry would have with them a so-called collection sheet. This was made up in advance at petitioner's office. Customers were listed according to routes, there being one sheet for each route. The customer's name and the amount of his week's bill appeared on the *240 left hand side of the sheet. On the right hand side was noted the amount of discount (sometimes also called allowance, refund, or rebate) payable to the customer in accordance with the agreement with petitioner It was the consistent practice of both Louis and Harry to present the customer with the amount of the cash discount, as indicated on the collection sheet, at the same time that the customer received and paid the bill. No reference to the discount or the amount thereof appeared on the customer's copy of his bill. Petitioner did not have agreements to pay discounts with all of its wholesale customers and therefore not all wholesale customers got rebates. With respect to the small group of wholesale customers, about five per cent of the total who paid petitioner's drivers daily for merchandise, rebates were not given until the end of each month. Petitioner's agreements with its customers related to future sales and were not applied retroactively. Occasionally the agreed rate of discount was increased by reason of customers' insistence. The revised agreements in most instances applied prospectively. Petitioner lived up to the agreements which it made with customers respecting *241 payment of discounts. It did not request or receive receipts for the discounts which it paid. It was not petitioner's practice to give its customers money to assist them in the purchase of equipment. In order to pay out the first few cash discounts on a given day, Harry and Louis used their own funds. Cash collected from customers during the day was used for subsequent discount payments. Louis and Harry noted the amount of their own cash on the collection sheet and reimbursed themselves at the end of the day. All other cash and checks collected from customers were turned in at petitioner's office at the end of the day. The amount turned in by Louis and Harry on any given day was the total amount collected as per invoices, less the amount of discounts paid out. Petitioner employed as its Assistant Secretary-treasurer and Office Manager Charles H. Yablonsky, who was not related to the Max family. In addition to supervising all of petitioner's bookkeeping records, Yablonsky had charge of all of petitioner's receipts and disbursements. Petitioner maintained a full set of bookkeeping records including drivers' sales books containing daily tickets for all sales, invoices for all *242 merchandise sold to wholesale customers which served as a wholesale sales journal, a wholesale Accounts Receivable Ledger, General Ledger, General Journal, Daily Cash Receipts Book, Summary Cash Receipts Book, Bill Book, Cash Disbursements Book and Discount Book. Entries made on petitioner's books pertinent to the transactions here involved were as follows: (1) As weekly invoices were prepared the amounts shown thereon, at OMI minimum prices, were posted as a debit to the customer's accounts receivable account. (2) The full amount collected from each customer each day, without giving effect to any discount paid, was posted to the daily cash book and credited to the customer's account in the accounts receivable ledger. (3) Each discount was separately recorded in the discount book by entering the customer's name, the amount of the discount, and the date on which it was paid. In order to make up the difference between the amounts collected from customers and the amounts turned in to petitioner by Louis and Harry at the end of each day, Yablonsky drew a check on a bank account carried in the name of C. H. Yablonsky (hereinafter referred to as the "Yablonsky account"). Each such *243 check was deposited in petitioner's regular business account with the other amounts collected from customers. The effect of the foregoing entries was that petitioner's sales were recorded as having been made at OMI minimum prices without giving effect to discounts paid. Each month Yablonsky would estimate the amount needed for discount payments to customers. He would then draw a check on petitioner's general account and deposit it in the Yablonsky account. Withdrawals from its general account for deposit in the Yablonsky account were reflected on its books by a credit to cash and a debit to purchases. Substantially all amounts withdrawn from petitioner's general account and deposited in the Yablonsky account were disbursed to customers in the form of discounts. Such discounts, to the extent they were in apparent violation of OMI regulations, amounted to $23,700 for the taxable year ended April 30, 1954, and $26,595.20 for the taxable year ended April 30, 1955. In the Federal income tax returns which it filed for the taxable years ended April 30, 1954, and April 30, 1955, petitioner gave effect to the discounts paid to customers in such years in the respective amounts of $23,700 *244 and $26,595.20 by including such amounts in cost of goods sold in the computation of gross income. Respondent's explanation for the adjustment giving rise to the deficiency determined for the taxable year ended April 30, 1954, as set forth in the statement annexed to the Notice of Deficiency, was as follows: It has been determined that for the taxable year ended April 30, 1954 your deduction for purchases is not allowable to the extent of $23,700.00 thereof, which amount consists of rebates to customers in violation of regulations issued by the Director of the New Jersey Office of Milk Industry. Respondent's explanation for the deficiency determined for the taxable year ended April 30, 1955, was identical to that given for the prior taxable year except that the amount disallowed as purchases was $26,595.20. On or about January 18, 1955, the Director of OMI (hereinafter referred to as the "Director") served upon petitioner an order to show cause why petitioner's license as a New Jersey milk dealer should not be revoked or suspended. The Director alleged in the order to show cause that petitioner had violated the (Milk Control) Act [1] in the following two respects: (1) By *245 selling milk to some 142 named customers at less than minimum prices fixed by OMI contrary to N.J.S.A. 4:12A-29 * * *; and (2) By entering into secret agreements, arrangements or contracts with each of the 142 customers to sell milk at less than OMI minimum prices contrary to N.J.S.A. 4:12A-30 * * *. *246 After being served with the Director's Order to Show Cause, petitioner participated in a number of conferences with its counsel, Jacob Fox, as well as with many other milk dealers who had been served with the same type of process. Eventually, petitioner was advised by a State official that unless it settled the matter by making a payment to OMI in the amount of $10,000, its license to do business as a milk dealer would be revoked. On August 4, 1955, petitioner, through its counsel, Jacob Fox, remitted $10,000 to the Director as an "adjustment" pursuant to N.J.S.A. 4:12A-43. On August 5, 1955, the Director signed a document addressed to petitioner, wherein he acknowledged that all violations of the Act by petitioner had "been adjusted pursuant to and under the authority of Section 43 (N.J.S.A. 4:12A-43) of the said law, and that, the amount of said adjustment having been paid by the said company, no further proceedings shall be had under any such violations." On August 8, 1955, the Director wrote to petitioner enclosing the document just described and acknowledging receipt of $10,000 from petitioner. The records of OMI, maintained on the basis of a fiscal year ending June 30th, *247 show that over a seven-year period (1954 through 1960) the Director has held informal hearings relating to violations of minimum prices for the resale of milk in New Jersey, that each hearing resulted in an adjustment under N.J.S.A. 4:12A-43, and that the number of such informal hearings and the amounts of adjustments resulting therefrom were as follows: Number of
Fiscal Year
Informal
Ended June 30
Hearings
Adjustments
1954
230
$15,105
1955
823
81,270
1956
151
32,180
1957
106
26,835
1958
198
14,315
1959
147
11,249
1960
442
19,810 The smallest adjustment imposed by the Director of OMI during the period from 1954 through 1960 was $10; the largest adjustment was $10,000. Between May 1, 1953, and the present, there have been periods when prices for resale of milk in New Jersey were fixed and periods when they were not fixed. OMI experience shows that respect for minimum resale prices varies from time to time depending on conditions which cause price cutting. The actual prices at which petitioner sold its milk and related dairy products were the net prices arrived at by reducing invoiced prices by the amounts of discounts agreed upon in *248 advance between petitioner and its customers. The amounts of discounts paid by petitioner are excludable from gross sales in the computation of its gross income. Opinion RAUM, Judge: The only question for decision is identical with the first issue in Atzingen-Whitehouse Dairy, Inc., 36 T.C. , decided this day. Following the conclusion announced in that case, Decision will be entered for the petitioner. Footnotes
1. The Act provides, in part, as follows: 4:12A-29. Milk purchased for less than minimum price; prohibition against sale and distribution No milk dealer, processor, subdealer or store shall distribute, sell or handle milk in this State which is obtained from any producer, other milk dealer, processor, subdealer or store where the milk has been purchased either directly or indirectly for a price less than the minimum price fixed by the director to be paid for such milk to be distributed in a given market. L. 1941, c. 274, p. 725, § 29. 4:12A-30. Secret agreement for price reduction prohibited; exception No licensee or other person, association or corporation shall hereafter contrary to the public interest operate in any municipality under any mutual or secret agreement, arrangement, combination, contract or common understanding, with any other licensee or person, firm, association or corporation, whereby the price for milk to be paid to producers in this State is reduced or the price to be paid by dealers, processors, subdealers, stores or consumers for such milk is decreased in pursuance of such mutual or secret agreement, arrangement, combination, contract or common understanding, and each such contract, arrangement, agreement or understanding is hereby prohibited and declared to be contrary to the public interest and in restraint of trade and commerce, and shall subject the violator or violators to the penalty in this act prescribed; provided, however, that the right may be granted to deduct a check-off to be paid an association or corporation with consent of producer and approval of the director. L. 1941, c. 274, p. 725, § 30. 4:12A-39. Violations of act; penalty; seizure and sale Any person who shall violate any of the provisions of this act or the orders, rules and regulations of the director as adopted from time to time shall be deemed guilty of a violation of the provisions of this act and shall pay a penalty of not more than fifty dollars ($50,00) for the first offense and not more than two hundred dollars ($200.00) for the second, or each subsequent offense, and such penalty when collected shall be paid to the Treasurer of the State of New Jersey and become a part of the general fund of the State of New Jersey. Any milk as herein defined which is the subject of the violation of this act or the orders, rules and regulations of the director, may be seized, and any part thereof may be sold as the director or court may direct; the proceeds from such sale to be paid to the Treasurer of the State of New Jersey to abide the further order of the director or court, and if no such order is made then to become a part of the general fund of the State of New Jersey. L. 1941, c. 274, p. 732, § 39. 4:12A-41. Penalties, collection of; commitment to jail The County Courts and the county district courts shall have jurisdiction of actions for penalties under this act and such penalties shall be collected and enforced in a summary manner pursuant to the "penalty enforcement law" ( § 2A:58-1 et seq.). If judgment be rendered for the plaintiff and the defendant fail forthwith to pay the amount of the judgment and the costs and charges incident thereto, said defendant may be committed to the county jail for any period not exceeding one hundred days. L. 1941, c. 274, p. 733, § 41; L. 1953, c. 5, p. 39, § 36. 4:12A-43. Informal hearings on violations; adjustments Upon receiving evidence of a violation of any of the provisions of this act or of any of the rules, regulations or orders of the director, any employee designated by the director is hereby empowered to hold informal hearings upon said violation or violations at such place or places as the director may fix and upon finding the violations to have been committed, to adjust same with any person accused of violating any provisions of this act or the rules, regulations or orders of the director, for such amounts as may in the discretion of the director, be proper under the circumstances. In the event of the violator making payment of the sum set in adjustment, no further prosecution shall be had upon any violation so adjusted. L. 1941, c. 274, p. 735, § 43. 4:12A-45. Disposition of license fees, penalties, fines and costs All funds derived from fees for licenses issued hereunder are hereby appropriated to pay the expenses of the operation of the department, and the proceeds of adjustments of penalties collected by the director and the proceeds of fines and costs imposed by any court hereunder shall be paid to the State Treasurer. L. 1941, c. 274, p. 736, § 45.↩